TOWN OF RIVERHEAD AND ANNA SLAVONIK,

Plaintiffs,

VERSUS

CSC ACQUISITION – NY, INC. (CABLEVISION),

Defendant.

**MEMORANDUM AND ORDER**
May 28, 2009

JOSEPH F. BIANCO, District Judge:

Plaintiffs Town of Riverhead ("the Town") and Anna Slavonik (collectively, "plaintiffs") seek preliminary injunctive relief ordering defendant CSC Acquisition – NY, Inc. ("Cablevision"), the Town's television cablecast provider, to revert the broadcast of public, educational and government access ("PEG") channels, currently being delivered in a digital format, back to an analog format. Alternatively, plaintiffs seek an order compelling defendant to provide and install, free of charge, one digital-to-analog "converter box" for each and every analog television owned by a Town resident Cablevision subscriber. In this action, plaintiffs allege the following: (1) defendant's conversion of the PEG channels to a digital format constitutes unlawful "scrambling" in violation of 47 C.F.R. § 76.630(a); (2) the alleged violation of this federal regulation also breaches the provision of the Franchise Agreement (the "Agreement") between Cablevision and the Town which requires that Cablevision comply with applicable federal and state regulations; (3) charges levied for the installation and lease of digital-to-analog converter boxes constitute separate PEG access fees in violation of the Agreement; and (4) those charges also constitute unlawful "rate discrimination" against Ms. Slavonik and other similarly-situated subscribers who do not own digital televisions because they make the "basic service tier" more expensive for that group of individuals, in purported violation of 47 U.S.C. § 543(b)(7) and 16 N.Y. C.R.R. § 895.4(c)(11), both of which mandate that PEG channels be available on the lowest level of service, also known as the "basic service tier."

Defendant opposes the application for a preliminary injunction and further moves to dismiss the action in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), or, alternatively, to stay the lawsuit pending the determination of a series of related questions

certified to the Federal Communications Commission ("FCC") by the United States District Court for the Eastern District of Michigan.[1]

For the reasons set forth below, plaintiffs' motion for a preliminary injunction is denied. Specifically, plaintiffs have failed to demonstrate irreparable harm in the absence of injunctive relief because, among other things, any additional costs incurred by subscribers in order to obtain the PEG channels in digital format can be compensated by monetary damages should plaintiffs prevail in this lawsuit. With respect to Cablevision's motion to dismiss and/or stay the proceedings, the motion is granted in part and denied in part. In particular, plaintiffs' cause of action under 47 C.F.R. § 76.630(a) and the related contractual claim under Paragraph 17.1 of the Agreement based on an alleged violation of Section 76.630(a), are dismissed as a matter of law for failure to state a claim because digitization is not, by itself, scrambling or encryption within the plain meaning of Section 76.630(a). The remainder of plaintiffs' claims are stayed pending the outcome of the aforementioned agency proceedings before the FCC.

I. BACKGROUND

A. Facts

The following facts are undisputed for the purposes of these motions, unless otherwise indicated.

Cablevision is a corporation, duly organized under the laws of the State of Delaware, which provides cable television and other communication services to the Town's cablecast area. (Complaint "Compl." ¶ 3.) On or about December 3, 2002, the Town and Cablevision executed a Franchise Renewal Agreement whereby Cablevision was granted the non-exclusive right to construct, operate, and maintain a cable system for the purpose of providing cable service, cable internet service, and other forms of broadband communications and telecommunications services to the Town's residents and/or cablecast viewers for a term of ten years. (*Id.* ¶ 4.) The Agreement states, under the heading "Public, Educational and Governmental Access," that:

> 17. 1: Franchisee shall comply with applicable federal and State law, rules, and regulations pertaining to non-commercial public, educational, and governmental (PEG) access to the System.
>
> 17.2: <u>Public Access.</u> Franchisee shall designate one (1) channel on its Cable System as a Public Access Channel . . . .
>
> 17.3: <u>Government/Education Access.</u> Franchisee shall, in accordance with Section 595.4(b) of the NYSPSC Rules and Regulations, designate to the Town, and the schools, and school districts within the Town, for its[] exclusive use at least one (1) full-time activated Government Access Channel/Educational Access Channel . . . . Notwithstanding anything

---

[1] *City of Dearborn v. Comcast of Michigan III*, No. 08-10156, 2008 WL 4534167, at *11-*12 (E.D. Mich. Oct. 3, 2008) (hereinafter "*Comcast III*").

contained in the Franchise to the contrary, channels designated pursuant to this Section 17.3 shall be included in the lowest level of service offered by the Franchisee on the Cable System.

. . .

17.9: Franchisee agrees that it shall not pass through, as a separate line item charge to subscriber's bills (in the form of a PEG access fee or payment), costs incurred by Franchisee in fulfillment of any commitments made in this Section 17.0 of the Franchise.

(*Id.*, Ex. A, ¶ 17.)

On or about September 16, 2008, Cablevision transferred the Town's PEG channels from an analog viewing format to a digital viewing format, thereby rendering the Town cablecast subscribers with analog-only televisions incapable of viewing those channels without a digital converter box. (Compl. ¶ 5.) At that time, approximately 1,900 of Cablevision's 13,000 subscribers in the Town were analog-only customers. (Olsen Aff. ¶ 4.) Approximately one month prior to the transition, Cablevision provided notice to all of its customers informing them of the impending switch. (*Id.*) Cablevision specifically informed its analog-only customers, by postcard mailed via United States Postal Service on August 11, 2008, that they could continue to receive PEG channels without additional cost by calling the telephone number provided in the notice, whereupon they would be offered the use of a digital converter box free of charge.[2] (*Id.*; Olsen Supp. Decl. ¶ 3, Ex. 2-3.) The offer for the free converter box was to expire on October 16, 2008, but Cablevision extended the offer through December 31, 2008. (Olsen Supp. Decl ¶¶ 3, 5.) Cablevision also informed the Town of the impending switch via letter mailed to Riverhead Town Supervisor, Phillip Cardinale, on August 8, 2008. (*Id.* ¶ 2, Ex. 1.)

Analog-only subscribers who wished to install a digital converter box after December 31, 2008 had the following options: (1) leasing one from Cablevision at a charge of $6.50 per month;[3] (2) leasing a cable card and inserting it in a digital television equipped with cable card access; (3) using a "Tivo" or any other similar external device; or (4) purchasing a digital television equipped with a QAM tuner. (Olsen Aff. ¶ 3.) Ultimately, 84 of the Town's approximately 1,900 analog-only customers received free converter boxes pursuant to the limited-time offer. (*Id.* ¶ 23.)

---

[2] Counsel for plaintiffs does not dispute that such notice was sent, but stated at oral argument that the notice was unclear, and therefore insufficient to properly notify analog-only subscribers about the impending switch and the availability of the free converter boxes. The notice stated as follows: "As we continue to make technological enhancements to our services, the following information is important to review. **As of 9/16/08, the following channels will only be available with a digital cable box: Public Access (Ch. 20), Educational Access/Government Access (Ch. 22).** If you wish to continue to receive these channels at no additional cost, please call us at 1-800-353-9821 and select option 3 when prompted." (Olsen Supp. Decl., Ex. 2 (bold in original).) The Court finds nothing ambiguous about the notice.

[3] Counsel for plaintiffs represented at oral argument that the monthly cost of leasing a converter box is now $6.75.

Plaintiff Anna Slavonik, who is an analog-only subscriber to Cablevision in the Town, attempted to view the PEG channels at some point after the September 16, 2008 switch and was unable to do so. (Compl. ¶ 17.) On December 19, 2008, approximately two months after the switch but before Cablevision's converter box offer expired, Slavonik called Cablevision to inquire about the channels and was allegedly told that "for these channels to be viewed it would cost [her] approximately $45 initially and a fee of $6.50 per month. No other solution was offered to [her]." (Slavonik Aff. at 2.)

Cablevision maintains that the switch to digital format reflects an ongoing nationwide trend and is responsive to a strong growth in demand for digital services by Cablevision subscribers.[4] (Olsen Aff. ¶ 2.) To that end, Cablevision submits that the switch enables it to provide its customers with a greater number of high-definition and on-demand video services, thereby staying competitive with other high-definition service providers such as Verizon, DirecTV and DISH, who have not been restricted from digitizing services. (*Id.* ¶¶ 2, 21.)

B. Questions Certified to the FCC

In January 2008, the City of Dearborn, Michigan brought suit against its cable provider, Comcast of Michigan, in the United States District Court for the Eastern District of Michigan, seeking to enjoin Comcast from converting the PEG channel signal from analog to digital format. *City of Dearborn v. Comcast of Mich.*, 558 F. Supp. 2d 750 (E.D. Mich. 2008) (hereinafter "*Comcast I*"). As one of its claims, the City argued, (as plaintiffs do in the instant action), that the conversion effectively removed the PEG channels from the "basic service tier" in violation of 47 U.S.C. § 543(b)(7)(A)(ii), which states that "[e]ach cable operator of a cable system shall provide its subscribers a separately available basic service tier . . . which . . . shall . . . consist of . . . [a]ny public, educational, and governmental access programming required by the franchise of the cable system to be provided to subscribers." The court granted the City's application for a preliminary injunction that same month, *see Comcast I*, 558 F. Supp. 2d at 750, and addressed the motion to dismiss the action in a decision issued on October 3, 2008. *City of Dearborn v. Comcast of Mich. III*, No. 08-10156, 2008 WL 4534167, at *6 (E.D. Mich. Oct. 3, 2008). In ruling on defendant's motion to dismiss, the court determined that the City's claim brought pursuant to 47 U.S.C. § 543(b) presented novel policy issues best addressed by the "technological expertise" of the FCC, and therefore a stay of the claim pending agency determination of those issues was warranted under the doctrine of primary jurisdiction. *Id.* at *9-*10. Accordingly, the court certified six questions to the FCC for

---

[4] The Court further notes, by way of background, that "[b]ecause Congress mandated that the last day for full-power television stations to broadcast in analog would be June 12, 2009, all over-the-air TV broadcasts will be in digital after that date." Federal Communications Commission, "What You Need to Know About the Digital TV Transition – Will You Be Affected," *available at:* http://www.dtv.gov/affected.html (last visited on May 28, 2009). Pursuant to this transition, consumers with analog-only televisions will need to either purchase a digital television or obtain a converter box in order to watch "free" broadcast television. *See* Federal Communications Commission, "What You Need to Know About the Digital TV Transition – Frequently Asked Questions," *available at*: http://www.dtv.gov/consumercorner.html (last visited on May 28, 2009).

4

determination, two of which directly impact the issues presented herein:

> Are cable operators precluded from charging for equipment used in connection with the reception of PEG channels on the basic service tier?
>
> Is digitization of PEG channels "discriminatory" because some customers may be required to obtain additional equipment to view the channels?

*Id*. at \*12. These questions remain pending before the FCC in the matter of *City of Dearborn v. Comcast of Mich. III, Inc.*, MB Docket No. 09-13 (2009).

### C. Procedural History

Plaintiffs filed an application for a preliminary injunction in the Supreme Court of the State of New York, Suffolk County, on January 14, 2009. By notice of removal dated January 27, 2009, defendant removed the action to this Court. Defendant filed its opposition to plaintiffs' application on February 3, 2009. Plaintiffs submitted their reply on February 18, 2009. Defendant moved to dismiss the action on April 3, 2009. Plaintiffs opposed defendant's motion on April 20, 2009. Defendant filed its reply on April 30, 2009. Oral argument was heard on May 8, 2009.[5] This matter is fully submitted.

---

[5] Both sides agreed at oral argument that, with respect to the preliminary injunction motion, they were not seeking an evidentiary hearing to resolve any factual disputes; rather, they agreed that the Court could decide the issue based upon the written submissions, including affidavits, by both sides.

## II. STANDARD OF REVIEW

### A. Preliminary Injunction

The preliminary injunction "'is one of the most drastic tools in the arsenal of judicial remedies.'" *Grand River Enters. Six Nations v. Pryor*, No. 02-CV-5068 (JFK), 2006 U.S. Dist. LEXIS 35614, at \*16 (S.D.N.Y. June 1, 2006) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)). In order to prevail on a motion for a preliminary injunction, a party must establish: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (quoting *Merkos L'Inyonei Chinuch, Inc. v. Ostar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)); *Iron Mountain Info. Mgmt., Inc. v. Taddeo*, No. 06-CV-2164 (JFB) (AKT), 2006 WL 1867049, at \*6 (E.D.N.Y. June 30, 2006).

The first requirement, that of irreparable harm, is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam) (internal quotations omitted). "To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (internal quotations omitted). A preliminary injunction is not appropriate where monetary damages will serve as adequate compensation. *Id.* Moreover, "[t]he law in this circuit requires a showing that irreparable damages are likely, not merely

5

possible." *Goldblatt v. Englander Commc'ns, LLC*, 431 F. Supp. 2d 420, 425 (S.D.N.Y. 2006); *see Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152, 155 (E.D.N.Y. 1986) ("A successful plaintiff must demonstrate that absent interim relief it will suffer an injury that is neither remote nor speculative, but actual and imminent."). As to the second requirement, it is well-settled that a plaintiff seeking "an injunction altering, rather than maintaining, the status quo, . . . must meet the more rigorous standard of demonstrating a clear or substantial showing of a likelihood of success on the merits." *Almontaser v. N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal quotations and citation omitted); *see also Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) (when issuance of an injunction will alter rather than maintain status quo, issuance of the injunction is proper "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief") (internal quotations and citations omitted). In the instant case, plaintiffs seek an order directing defendant to change the broadcast format of PEG channels from its current digital format back to analog, thereby altering the status quo, and are therefore subject to this more stringent standard of a "clear or substantial likelihood of success on the merits."

B. Motion to Dismiss

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, No. 07-1015, 2009 WL 1361536 (May 18, 2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 2009 WL 1361536, at *12.

Further, in connection with a motion to dismiss under Rule 12(b)(6), the Court may only consider "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." *Nechis*, 421 F.3d at 100; *accord Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).[6]

---

[6] In their motion papers, plaintiffs also urge the Court to consider a letter drafted by Monica Shah Desai, Chief of the Media Bureau of the FCC, on January 18, 2009 and addressed to a non-party, as well as Ms. Desai's related testimony before Congress on September 17, 2008. (*See* Plaintiffs' Opposition, Exs. 1-2.) The Court can, and has, considered these documents in connection with the preliminary injunction motion and nothing in these documents alters the Court's analysis as to the absence of irreparable harm to plaintiffs. Similarly, with respect to the motion to dismiss or stay the lawsuit, Ms. Desai's views are certainly not the final determination by the FCC on the issues in the instant case because, as discussed *infra*, such issues are still pending before the FCC. Thus, despite the statements by Ms. Desai, the

6

### III. DISCUSSION

Presently before the Court are plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss the action for failure to state a claim. The Court analyzes each motion, in turn.

### A. Preliminary Injunction

As stated above, plaintiffs must satisfy a heavy burden in order to prevail on their motion for a preliminary injunction, demonstrating both irreparable, actual harm that cannot be satisfied by monetary damages at a later date, as well as a clear or substantial showing of likelihood of success on the merits. For reasons set forth below, the Court finds that the preliminary injunction motion must be denied because plaintiffs have failed to establish irreparable harm and, therefore, the Court need not address the issue of likelihood of success on the merits.

Plaintiffs argue that Ms. Slavonik, as well as the approximately 1,900 Town subscribers with analog-only televisions have been, and are currently, suffering irreparable harm without access to the PEG channels, which have been broadcast in the digital format since September 2008. They further submit that, although Town subscribers with both analog-only and digital televisions can still view the PEG channels on their digital televisions in their home, they, too, are harmed by being forced to "change their viewing habits by changing viewing locales in their own households." (Plaintiffs' Memorandum of Law, at 12.)

The Court finds these arguments unavailing. First and foremost, any harm allegedly suffered by the aforementioned Town subscribers is speculative at best, as only one such individual, Ms. Slavonik, has joined the instant action as a plaintiff. No other individual subscribers are plaintiffs in this lawsuit or have otherwise submitted any evidence attesting to injury incurred as a result of the conversion. It is undisputed that over 85% of the Town's Cablevision customers are already digital subscribers and continue to receive PEG channels without interruption. Of the remaining 15%, or approximately 1,900 customers, who are analog customers, Cablevision does not have records which indicate how many of those customers have televisions with digital tuners, "TiVo" boxes, or some other, independent means of viewing programs in digital format. Thus, it is unclear how many of these 1,900 customers are actually unable to view the PEG channels in digital format. Moreover, Cablevision gave written notice to all its potentially affected analog customers of the PEG digitization initiative in August 2008 and provided them with an opportunity to continue to receive PEG channels without additional cost by contacting Cablevision, which would provide a free digital converter box capable of receiving digital PEG channels at no charge for the duration of their Cablevision subscription. Cablevision subsequently extended the free digital converter box offer from October 16, 2008 to December 31, 2008, and provided further notice of that extension to its customers. During this over three-month period, only 84 of the approximately 1,900 customers contacted Cablevision to receive the free digital boxes. Under these circumstances, the Town has failed to show

---

doctrine of primary jurisdiction still counsels in favor of staying the action (with the exception of the Section 76.630 issue, which is not before the FCC and was not the subject of Ms. Desai's statements) to await the final determination by the FCC on the issues pertaining to this lawsuit that are currently pending before the FCC.

7

that, other than the one named plaintiff, there are any other analog subscribers in Riverhead who need, and/or want, digital converter boxes so that they can continue to view PEG channels. Any argument by the Town regarding any harm, no less irreparable harm, being experienced by this group of customers is entirely speculative and does not support injunctive relief.[7] *See, e.g., SS&C Techs., Inc. v. Providence Inv. Mgmt.*, 582 F. Supp. 2d 255, 256 (D. Conn. 2008) ("The threat of irreparable harm, moreover, must be actual and imminent, not remote or speculative.") (citing *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002), *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) and *Jackson Dairy, Inc. v. HP Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)); *see also Limonium Mar., S.A. v. Mizushima Marinera, S.A.*, 961 F. Supp. 600, 611 (S.D.N.Y. 1997) (rejecting claim of irreparable harm where movant's "allegations amount[ed] to nothing more than speculation and conjecture").

Second, plaintiffs have failed to demonstrate that the harm suffered by Ms. Slavonik, the one individual plaintiff (or any other potential subscribers in that category), cannot be addressed by monetary damages. *See Tucker Anthony Realty Corp.*, 888 F.2d at 975 (preliminary injunction is unwarranted where monetary damages will suffice "unless the movant provides evidence of damage that cannot be rectified by financial compensation"); *see also Jamaica Ash & Rubbish Removal Co., Inc. v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (ruling that if a monetary award will provide adequate relief for the alleged injury, a preliminary injunction is not appropriate). Specifically, the Court notes that Ms. Slavonik has the immediate option of viewing the PEG channels in digital format with a converter box, should she choose to either lease or purchase one. Assuming she chooses the former option and incurs a one-time fee of $45 in addition to a monthly fee of $6.75 during the pendency of this action, her monetary damages will approximate $126 for the first year and $81 per year thereafter. Plaintiffs have not represented that Ms. Slavonik is indigent and her damages are clearly monetary ones that can be rectified with financial compensation should plaintiffs ultimately prevail in this action. *Accord City of Dearborn v. Comcast of Mich.*, 558 F. Supp. 2d 758, 758-59 (E.D. Mich. 2008) (individual plaintiff would not suffer irreparable harm from cablecast provider's conversion of PEG channels to digital format because "[s]he could request and receive Defendants' converter free of charge for one year. If she has more than one television she can be compensated in money damages for any rental fees she pays, if Plaintiffs ultimately win[] this litigation."). The damages, which are clearly monetary in nature, are the same for any other unnamed Town analog subscribers, even assuming *arguendo* that such a class of aggrieved plaintiffs exists; as noted above, despite two notices informing Town subscribers of the conversion as well as an over three-month window in which those individuals could lease a converter box free of charge, only 84 subscribers took advantage of that opportunity, further undermining the allegation that this group of individuals is

---

[7] The related argument by the Town that, analog subscribers who only received one free digital converter box per household are being irreparably harmed because they can only view the PEG channels in one room of their homes (as opposed to being able to watch the channels on any television in the home), is similarly based entirely on speculation and is not a basis for the issuance of the requested injunction.

8

irreparably harmed by an inability to view PEG channels. Thus, the harm alleged by the Town – namely, that residents with analog televisions are now required to incur additional expenses to receive PEG channels in digital format – can be adequately addressed by monetary damages should the Town prevail on any of its claims in this lawsuit.

Finally, plaintiffs' collective delay in seeking to address the alleged injury also undermines their claim of irreparable harm. Ms. Slavonik has stated in her affirmation to the Court that she did not contact Cablevision regarding her inability to view the PEG channels until approximately three months after the conversion, indicating either that she did not notice the absence of the channels for that time period or she did notice, but was not motivated to take immediate action. Regardless, her claim of irreparable harm is undercut by her delay in pursuing a remedy. Likewise, although the conversion took place in September 2008 and the Town received advance notice of it, it did not file suit prior to the change, or even immediately thereafter, but waited until January 2009, some four months later, to bring the instant action. This delay belies any claim that the alleged harms are so pressing as to warrant such a drastic judicial remedy. *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (The "court should generally consider delay in assessing irreparable harm."); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm . . . ."); *see also Magnet Commc'ns, L.L.C. v. Magnet Commc'ns, Inc.*, No. 00 Civ. 5746 (RO), 2001 U.S. Dist. LEXIS 14460, at *4 (S.D.N.Y. Sept. 7, 2001) ("'[A]ny presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunction.'") (quoting *Imon, Inc. v. Imaginon, Inc.*, 90 F. Supp. 2d 345, 350 (S.D.N.Y. 2000)).

Accordingly, for all of the aforementioned reasons, the Court finds that plaintiffs have failed to demonstrate irreparable harm in the absence of the requested injunctive relief.[8] Having so determined, the Court need not consider plaintiffs' likelihood of success on the merits. *See Kamerling*, 295 F.3d at 214 (stating that "the moving party must show that [irreparable harm] is likely before the other requirements for an injunction will be considered") (citing *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam)). However, because defendant has moved to dismiss this action in its entirety, the Court proceeds to an analysis of that motion.

---

[8] The Court notes that, although the court in *Comcast I* issued a preliminary injunction, the circumstances in that case are distinguishable in several ways from the instant case. First, the preliminary injunction in *Comcast I* only maintained the status quo because PEG digitization had not yet occurred in that case at the time of the injunction, while in the instant case the injunction seeks to undo the status quo through a mandatory injunction that requires either a return to analog or additional free equipment being supplied by Cablevision to analog customers. Second, plaintiffs in *Comcast I* alleged that the cable operator failed to provide proper notice of the PEG digitization, while no such claim is contained in the instant complaint. Finally, the cable operator in *Comcast I* did not mitigate any claim of irreparable harm by having a more than three-month period where it provided analog customers with an opportunity to obtain one free converter box per household for the duration of their subscription.

9

B. Motion to Dismiss

Defendant moves to dismiss the entirety of plaintiffs' claims, arguing the following: (1) the conversion of the PEG channels to the digital format does not constitute impermissible "encryption" or "scrambling" under 47 C.F.R. § 76.630(a) and, therefore, does not violate the provision of the Agreement regarding adherence to federal law; (2) any charge levied for lease of a converter box does not constitute a separate line item fee in support of PEG channels, as prohibited by the Agreement; and (3) any rate discrimination claim is not cognizable under either 47 U.S.C. § 543(b)(7) or 16 N.Y. C.R.R. § 895.4(c)(11).

For the reasons set forth below, the Court agrees that digital conversion is not unlawful "encryption" or "scrambling" and, therefore, dismisses plaintiffs' first two causes of action for failure to state a claim as a matter of law. However, because the remainder of plaintiffs' claims are implicated by the questions already certified to the FCC, the Court finds that a stay of this action is warranted under the doctrine of primary jurisdiction until the resolution of those agency proceedings.

1. "Encryption" or "Scrambling"

Plaintiffs argue that the conversion of the PEG channels (which are part of the basic service tier)[9] from analog to digital format violates 47 C.F.R. § 76.630(a), which states, in relevant part, that "[c]able system operators shall not scramble or otherwise encrypt signals carried on the basic service tier." *Id.* Plaintiffs submit that this alleged violation of the federal regulation also breaches the Agreement provision mandating compliance with "applicable federal and State law, rules, and regulations." (Compl., Ex. A, ¶ 17.1.) Specifically, plaintiffs argue that, because viewers with analog televisions require a converter box in order to view the channels, their signal is necessarily being scrambled. (Plaintiffs' Opposition, at 10.) As set forth below, the Court disagrees.

There is no allegation that the digital transmission of television by Cablevision is being scrambled or encrypted by Cablevision. In fact, plaintiffs concede in the complaint that any Cablevision subscriber with a digital television set that contains a QAM tuner can receive the PEG channels simply by plugging the cable connection into the back of the television set. (Compl. ¶¶ 5, 18.) Thus, there is no need for a customer with a digital television to obtain a converter box or CableCard to unscramble or decrypt any basic service tier channels, including PEG channels. Instead, it is only individuals with older analog televisions that are unable to receive the digital signal. In other words, due to the emergence of digital format technology, older analog televisions require a converter box to change digital signals back into analog signals that these older televisions are capable of displaying. Plaintiffs contend that the mere fact that these individuals need a converter box to receive the digital signal on their analog televisions constitutes illegal "scrambling or encrypting" under Section 76.630(a). The Court rejects this claim as a matter of law because it is clear, based upon the allegations in the complaint, that the digital PEG channels are delivered by

---

[9] *See* 47 U.S.C. § 543(b)(7)(A)(ii) ("Each cable operator of a cable system shall provide its subscribers a separately available basic service tier . . . [s]uch basic service tier shall . . . consist of . . . [a]ny public, educational, and governmental access programming required by the franchise of the cable system to be provided to subscribers.").

10

Cablevision in the clear and any televisions capable of receiving digital signals will receive the PEG channels, without any additional equipment.

Taking plaintiffs' argument to its logical conclusion, if the transfer of the PEG signal to the digital format by itself constitutes scrambling, then the same could be said of the transfer of the remainder of the channels available on the basic service tier, and, obviously, that is not the case, for if it was, any digitization would be a violation of federal law.[10] Plaintiffs do not make such a claim, nor can they. Thus, the Court declines to rule that the *method* of delivery of the television signal (namely, digitization) constitutes an unlawful scrambling of the signal itself. Instead, the Court holds as a matter of law that digitization, by itself, is not scrambling or encryption under the plain meaning of Section 76.630(a). Because plaintiffs' claim under Section 76.630(a), and its related claim under Paragraph 17.1 of the Agreement, are based solely on the allegation that digital format itself is tantamount to encryption, such claims cannot survive a motion to dismiss.[11] *See*

*Comcast I*, 558 F. Supp. 2d at 758 (plaintiff did not demonstrate likelihood of success on claim that digitization of PEG channels amounted to encryption or scrambling in violation of 47 C.F.R. § 76.630(a)); *see also Comcast III*, 2008 WL 4534167, at *11 (noting that plaintiff abandoned this claim at motion to dismiss stage upon defendant's representation that "[t]he digital transmission will be sent 'in the clear' and may be received by all cable subscribers *with digital capabilities* without any degree of decoding") (emphasis added).

Accordingly, plaintiffs' cause of action under Section 76.630(a) of the Code of Federal Regulations is dismissed for failure to state a claim, as is the related breach of contract claim under Paragraph 17.1 of the Franchise Agreement.

2. Primary Jurisdiction

Defendant has also moved to dismiss plaintiffs' remaining claims on the grounds that the imposition of a leasing charge for a converter box (1) constitutes a separate line item fee in support of the PEG channels in violation of the Agreement, and (2) amounts to improper rate discrimination favoring subscribers who own digital televisions by creating a second, lower-priced tier of service, in violation of 47 U.S.C. § 543(b)(7) and 16 N.Y. C.R.R. § 895.4(c)(11), which both mandate that the lowest level of service include PEG channels. Defendant moves, in the alternative, to stay these claims pending the outcome of related agency proceedings. For the reasons set forth below, the Court declines to rule on the motion to dismiss these remaining claims at this juncture and, instead, grants defendant's motion to stay these claims

---

[10] This would be a particularly absurd assertion in light of the fact that Congress has mandated the digitization of over-the-air television broadcasts by June 12, 2009.

[11] In reaching this decision, the Court has considered whether this issue is more properly left for summary judgment. However, because the complaint only alleges a violation based upon the digitization itself, it fails as a matter of law for the reasons discussed above, even assuming all the allegations in the complaint to be true. Therefore, it can properly be decided at the motion to dismiss stage. Similarly, the Court does not believe that a stay on this claim is warranted under the "primary jurisdiction" doctrine because this issue is not currently under consideration by the FCC and is so clearly without merit that a referral on this issue to

the FCC is unwarranted.

pursuant to the doctrine of primary jurisdiction.

### a. Legal Standard

The "primary jurisdiction" doctrine applies "whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Fulton Cogeneration Ass'n v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)). "The aim of the doctrine . . . is to ensure that courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes." *Id.* (citing *Gen. Elec. Co. v. M.V. Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir. 1987)); *see also Crystal Clear Commc'ns, Inc. v. SW Bell Tel. Co.*, 415 F.3d 1171, 1174 n.2 (10th Cir. 2005) ("In essence, the [primary jurisdiction] doctrine represents a determination that administrative agencies are better equipped than the courts to handle particular questions, and that referral of appropriate questions to an agency ensures desirable uniformity of results.") (quoting *Williams Pipe Line Co. v. Empire Gas Corp.*, 76 F.3d 1491, 1496 (10th Cir. 1996)). In determining whether this doctrine warrants a stay of proceedings, the Second Circuit has identified four factors as the "focus of the analysis":

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. and Tel. Co.*, 46 F.3d 220, 222 (2d Cir. 1995). The Second Circuit has also noted that courts "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Ellis v. Tribune Television Co.*, 443 F.3d 71, 83 (2d Cir. 2006) (quoting *Nat'l Commc'ns Ass'n, Inc.*, 46 F.3d at 223 (2d Cir.1995) (internal quotations omitted)). *But see Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 n.2 (2d Cir. 2002) (noting that "the Supreme Court has never identified judicial economy as a relevant factor").

### b. Application

In the instant case, the Court finds that all of the aforementioned factors weigh in favor of a stay of proceedings on plaintiffs' remaining claims, as set forth in detail below.

First, the issue implicated, *i.e.*, cable television rate regulation and how it is impacted by the introduction of the new technology of digitization, is well within the expertise of the FCC and raises novel technical and policy considerations that have yet to be comprehensively addressed in any judicial forum or agency proceeding.[12] As the

---

[12] To that end, the Court notes that despite the recent trend toward digitization in cable markets across the nation and the June 2009 Congressional mandate, only two other federal district courts, in the Middle District of Florida and the Eastern

court in *Comcast III* noted, "[t]he issues . . . turn on the technological nature of the distinctions between analog and digital formats, a question not within the expertise of judges. The FCC's technological expertise would be especially helpful." 2008 WL 4534167, at *10. This Court concurs in that analysis.

Second, it is well-settled that matters regarding the regulation of the cable television industry fall within the purview of the FCC. *See Ellis v. Tribune Television Co.*, 443 F.3d 71, 86 (2d Cir. 2006) ("The FCC is 'expected to serve as the single Government agency with unified jurisdiction and regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio.'") (quoting *United States v. SW Cable Co.*, 392 U.S. 157, 168 (1968)); *see also In re Long Distance Telecomms. Litig.*, 831 F.2d 627, 630 (6th Cir. 1987) (granting FCC primary jurisdiction was appropriate "consider[ing] the pervasive nature of the FCC's regulatory authority over the communications industry"); *Comcast III*, 2008 WL 4534167, at *9 ("The FCC has 'special competence' in matters of cable technology. Not only would its expertise assist in the resolution of the distinctions and similarities of analog and digital service, the FCC's perch atop the technological progression of the cable industry from its inception allows it to apply its institutional knowledge to a new and emerging technology.").

Third, considering that questions implicating plaintiffs' remaining claims have already been referred to the FCC (as discussed *infra*), any determination of those issues prior to the conclusion of the agency proceedings necessarily poses a danger of inconsistent rulings. *See Ellis*, 443 F.3d at 88 ("Courts should be especially solicitous in deferring to agencies that are simultaneously contemplating the same issues."). As the Second Circuit has stated, when "an agency 'is currently conducting an investigation into the lawfulness of the [practice] under attack,' 'to permit the court below initially to determine [the issue] would invite the very disruption . . . that the doctrine [of primary jurisdiction] is meant to discourage.'" *Id.* (quoting *Danna v. Air Fr.*, 463 F.2d 407, 412 (2d Cir. 1972)). Such is the case here.

Fourth, an application regarding issues implicated by plaintiffs' remaining claims was made to the FCC prior to the onset of this litigation. *Comcast III*, 2008 WL 4534167, at *10-*12. It is well-settled that "[i]f prior application to the agency is present, this factor provides support for the conclusion that the

---

District of Michigan, respectively, have adjudicated claims arising from a cable provider's transfer of PEG channels from digital to analog format similar to those presented herein, and the latter court referred issues raised to the FCC. *See City of St. Petersburg v. Bright House Networks, LLC*, Case No.: 8:07-cv-02105-T-24-MSS; Case No.: 8:07-cv-02106-T-23-TBM, 2008 U.S. Dist. LEXIS 100576 (M.D. Fla. Dec. 12, 2008); *Comcast III*, 2008 WL 4534167, at *11-*12. In doing so, the court recognized both the novelty and importance of the issues presented, stating: "A fact that has become apparent through the progression of this litigation is that Congress did not contemplate the existence of digital cable as it is today. Nor did it contemplate a basic service tier which spans digital and analog formats. This is not surprising, given the rise in digital cable after the Telecommunications Act. Thus, to the extent the Court attempts to determine whether Comcast's proposed actions violate the requirement of the basic service tier, the Court is forced to apply an old rubric to a technology that was not foreseen by Congress in 1934, 1984, 1992, or 1996, when it otherwise spoke directly on these issues." *Comcast III*, 2008 WL 4534167, at *9.

doctrine of primary jurisdiction is appropriate." *Ellis*, 443 F.3d at 89 (citing *Oasis Petroleum Corp. v. U.S. Dep't of Energy*, 718 F.2d 1558, 1566 (Temp. Emer. Ct. App. 1983)). Specifically, the FCC is currently reviewing, but has yet to issue an opinion on, *inter alia*, the following questions:

> Are cable operators precluded from charging for equipment used in connection with the reception of PEG channels on the basic service tier?
>
> Is digitization of PEG channels "discriminatory" because some customers may be required to obtain additional equipment to view the channels?

The FCC's determination of these questions will undoubtedly provide guidance to this Court regarding whether defendant may charge a leasing fee for a converter box, which plaintiffs argue constitutes an impermissible separate line item fee charged in support of PEG channels. Likewise, the agency ruling will also address whether the imposition of that fee amounts to unlawful rate discrimination between subscribers who own digital televisions and those who do not by creating two unequal levels of basic service. Therefore, this pending application before the FCC lends further support to the issuance of a stay in the instant proceedings. *See Ellis*, 443 F.3d at 89 (prior application weighed in favor of a stay); *Oasis Petroleum Corp.*, 718 F.2d at 1566 (same); *Frontier Tel. of Rochester, Inc. v. USA Datanet Corp.*, 386 F. Supp. 2d 144, 150-51 (W.D.N.Y. 2005) (same); *N.Y. State Elec. and Gas Corp. v. N.Y. Indep. Sys. Operator, Inc.*, 168 F. Supp. 2d 23, 30 (N.D.N.Y. 2001) (same).

Finally, with respect to the issue of undue delay and judicial economy, the Second Circuit explained in *Ellis*:

> [I]n analyzing the potential advantages of applying the doctrine against the potential costs, we recognize that, because primary jurisdiction is a mechanism for streamlining judicial review, courts (including this Court) have sometimes refused to recognize a primary jurisdiction claim where agency referral would result in undue delay. However, more recently, we have noted that such considerations of judicial economy should not be considered because the Supreme Court has consistently held that there are only two purposes to consider in determining whether to apply the primary jurisdiction doctrine – uniformity and expertise and the Supreme Court has never identified judicial economy as a relevant factor.

443 F.3d at 90 (quotations and citations omitted). The Court then noted that "even assuming that judicial economy could be considered (as an aspect of agency expertise or otherwise), we do not believe that the possibility of additional agency delay would have counseled against primary jurisdiction because this case . . . involves highly complicated factual and policy disputes that the FCC is uniquely well-situated to address." *Id*. Similarly, in the instant case, to the extent that judicial economy could be considered

under agency expertise or otherwise, the possibility of undue delay or potential costs does not weigh against a stay in the instant action. The parties have not engaged in discovery, thereby avoiding unnecessary expense, nor have they represented that they would incur any overly burdensome costs in awaiting an agency decision on the issues presented herein. Regarding any purported delay, the Court notes that the questions implicated by this lawsuit were referred to the FCC before plaintiffs even filed suit and are currently under consideration. Therefore, even assuming *arguendo* that judicial economy could be considered as a factor, any possibility of additional agency delay would not weigh against a stay of proceedings given the totality of the circumstances. *See id.*

Because the Court finds that the issues implicated by plaintiffs' remaining claims "have been placed within the special competence of an administrative body," *Fulton Cogeneration Assoc.*, 84 F.3d at 97, a stay of this action pending the outcome of related FCC proceedings is warranted to avoid inconsistent rulings and allow the FCC an opportunity to use its technological expertise to decide this issue. Although defendant has moved to dismiss the claims outright, a stay is the more appropriate course of action. *See Ellis*, 443 F.3d at 92 ("Overall . . . the district court should have invoked the primary jurisdiction doctrine and allowed the FCC to address this licensing matter in the first instance. Such an approach would have avoided the subsequent inconsistent rulings and allowed the FCC to exercise its expertise and discretion in deciding Tribune's waiver request."); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 60 (2d Cir. 1994) ("[T]he judicial hand should be stayed pending reference of plaintiff's claims to the agency for its views.") (citing *United States v. W. Pac. R.R.*, 352 U.S. 59, 63-64 (1956)); *N.Y. State Elec. and Gas Corp.*, 168 F. Supp. 2d at 30 (choosing to impose a stay of the action, rather than dismissal of the claims, pending agency action). As the Second Circuit has emphasized, "[a] federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end . . . . [I]t is desirable that the agency and the court go down the same track – although at different times – to attain the statute's ends by their coordinate action." *Golden Hill Paugussett Tribe of Indians,* 39 F.3d at 59.

Accordingly, plaintiffs' remaining claims are stayed pending resolution of questions certified to the FCC by the United States District Court for the Eastern District of Michigan.

15

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' application for a preliminary injunction is DENIED. Defendant's motion to dismiss and/or stay the proceedings is GRANTED in part and DENIED in part. Plaintiffs' first two causes of action – namely, plaintiffs' claim under 76 C.F.R. § 76.630(a) and the related contractual claim under Paragraph 17.1 based upon a purported violation of Section 76.630(a) – are both dismissed for failure to state a claim. Defendant's motion to dismiss the remaining causes of action is denied at this juncture (without prejudice to renewal) and the instant action is hereby stayed pending the outcome of the agency proceedings before the FCC arising from the *Comcast* lawsuit in the Eastern District of Michigan.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 28, 2009
Central Islip, New York

\* \* \*

The attorneys for plaintiffs are Daniel P. McCormick and Dawn C. Thomas, Esqs., Riverhead Town Attorney, 200 Howell Avenue, Riverhead, New York 11901. The attorneys for defendant are David Dunn and Hoa Thanh Thi Hoang, Esqs., Hogan & Hartson LLP, 875 Third Avenue, New York, New York 10022.